# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **v.** | **)** | **2:16-cr-00044-JDL** |
| | **)** | |
| **CHARLES FLORES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Charles Flores is charged with possessing with intent to distribute a controlled substance, in violation of 21 U.S.C.A. § 841(a)(1) (2016). Flores has moved to suppress all evidence obtained as a result of a pat-down search and a subsequent search of a hotel room by police officers on March 21, 2016. ECF No. 19. I grant the motion in part with respect to certain statements made by Flores, but otherwise deny the motion.

## I. FACTUAL BACKGROUND

On March 21, 2016, Thomas Pappas and Brian Bourgoin, task force officers with the U.S. Drug Enforcement Agency, received a tip from a confidential informant, relayed by another DEA Agent, that the confidential informant's friend had information that a group of individuals from New York was selling fifty- and one hundred-dollar pieces of crack cocaine at a hotel in Brunswick, Maine. Pappas and Bourgoin, who were both dressed in plain clothes, drove to the hotel at approximately 4:00 p.m. that afternoon. They identified themselves as police officers to the front desk clerk, and obtained a guest registry. Pappas and Bourgoin discovered that one of the 37 occupied rooms in the hotel, Room 131, had been rented with cash. Pappas

testified that paying for a room in cash is a possible indicator of criminal activity. Pappas walked through the hotel's hallway past Room 131, and noted that it was located near an eastern entrance leading to the exterior of the hotel.

Pappas then walked around the perimeter of the hotel. When he met with Bourgoin in the parking lot in front of the hotel, Bourgoin informed him that a man had just parked in the lot, and walked around the eastern side of the building, near the eastern entrance. Pappas and Bourgoin then observed the same man return from the eastern side of the building, get in his car, and drive off. The officers followed the car for a short distance in an effort to obtain its registration information, but lost the car in traffic.

Pappas and Bourgoin then returned to the hotel, and Pappas spoke with the hotel's manager about the hotel's video surveillance. During the conversation, the hotel manager volunteered that she thought she knew why the officers were at the hotel, and relayed her suspicions regarding possible drug activity in Room 131 based on the number of visitors to the room and the frequency of the occupants' coming and going. The manager told Pappas that the guests in Room 131 consisted of two African American men from New York, one of whom was obese, who had paid for the room in cash. There were also two women with them. The manager offered Room 132, an unoccupied room across the hall from Room 131, for the officers to use to conduct surveillance.

Pappas and Bourgoin entered Room 132 at approximately 5:00 p.m. The room had a large window which overlooked the parking lot in front of the hotel. The

peephole in the door afforded a view of the hallway and the door to Room 131. Shortly after the officers entered Room 132, Pappas observed a black sedan pull into a parking space directly outside the room's window. The car was occupied by two young men, who were sitting in the driver's and front passenger seats. An obese African-American man, later identified as Charles Flores, then walked up to the car from the direction of the hotel's eastern entrance, and joined the two men in the car. He sat in the right rear seat, behind the front passenger, and did not put on a seatbelt. Flores leaned toward the middle of the seat, and appeared to shift his weight and reach for something. Pappas then watched Flores engage in what looked like a hand-to-hand exchange with the man sitting in the front passenger seat. Pappas then saw Flores counting money. Flores then got out of the car and walked back toward the hotel's eastern entrance. The entire transaction lasted 20 to 30 seconds. The two young men then drove away.

The officers watched the hallway outside their room through the peephole for approximately ten minutes, but did not see Flores return. Pappas left the room and walked out of the hotel through the eastern entrance. He saw Flores standing outside the door, smoking marijuana. As Pappas went back inside the hotel through the eastern entrance, he asked Flores if he needed the door to remain propped open. In response, Flores said he had a key and pulled the key from his pocket, to indicate that he could unlock the door himself. Pappas went back inside to meet with Bourgoin, and then the two officers went outside to speak with Flores.

Pappas and Bourgoin approached Flores outside the eastern entrance, identified themselves as police officers, and placed Flores in handcuffs. They told Flores that he was not under arrest, but rather was being detained for a drug investigation. Flores identified himself to the officers and, in response to a question, stated that he was staying in Room 131. The officers performed a pat-down search, and Pappas noted that Flores was carrying two cell phones and a sum of money. At least one of the phones was emitting noises consistent with incoming calls or text messages. The officers then brought Flores into the hotel and walked to the door of Room 131.

Pappas testified that he heard what he believed to be voices coming from inside Room 131. Pappas then used Flores' room key to open the door of Room 131 and entered the room. The room was empty and Pappas discovered that the noise he thought to be voices was actually coming from a television set at a high volume. Pappas also observed a pair of scissors, a baggie, some cash, and a mason jar that appeared, and was later confirmed, to contain marijuana. The officers then brought Flores inside Room 131, and Pappas began to read Flores his *Miranda* warnings. Pappas was interrupted, however, by a knock on the door. Looking through the peephole, Pappas saw a woman and small child standing outside the door. He opened the door, displayed his badge, and invited the woman into the room. The woman said that she was an acquaintance of Flores' and had been sent to check on him by someone who lived in New York.

Pappas took the woman into Room 132 to interview her outside of Flores' presence. Pappas noticed that the woman's phone was receiving a number of phone calls and/or text messages. He asked the woman for permission to examine the phone, which she granted. When he showed her text messages containing a slang term for crack cocaine, the woman attempted to grab the phone out of his hands. At this point, the woman was secured in handcuffs and was brought into Room 131 to join Bourgoin and Flores.

At this time, Pappas fully recited the *Miranda* warnings to Flores, and Flores invoked his right to remain silent. Pappas then informed Flores that he intended to apply for a search warrant for the hotel room unless Flores consented to a search. Flores did not give his consent to search. Additional agents were called to the scene, and the woman was again brought to and interviewed in Room 132, this time by a female agent. During the interview, the woman provided additional information, including that she had intended to purchase cocaine base from Flores, that he was part of a drug trafficking organization, and that he was known to hide drugs about his body.

Pappas prepared an affidavit in support of a search warrant for Room 131, Flores' person, and any cell phones associated with Flores or Room 131. The search warrant was authorized by a judge at approximately 11:10 p.m. The resulting search of Room 131 yielded 105 baggies of heroin and $5,700 in cash, in addition to packaging materials and a digital scale. Flores also had 8 baggies of crack cocaine, 18 baggies of heroin, and $1,200 cash on his person.

## II. DISCUSSION

Flores argues that all of the evidence secured by the police as a result of his detention and the entry and search of Room 131 should be suppressed. ECF No. 19 at 12. He asserts that the entry and search of the room, as well as the seizure of his person, were undertaken without either probable cause or a warrant, and that none of the recognized exceptions to the warrant requirement apply to the room entry. *Id.* at 1. The Government contends that Pappas and Bourgoin had probable cause to believe a crime had been committed at the time they initially detained Flores, ECF No. 49 at 8-12, that the entry into the room was justified by exigent circumstances, ECF No. 22 at 16-17, and that the "independent source" doctrine applies to save the evidence from suppression, *id.* at 18.

### A.    Initial Detention

Flores argues that he was unlawfully arrested without probable cause when he was detained by the officers, beginning when he encountered them outside the eastern entrance to the hotel. ECF No. 57 at 12. The Government claims that the detention was a lawful investigatory stop under *Terry*, rather than an arrest, but that the officers in any event had probable cause to make an arrest at the time Flores was first detained. ECF No. 49 at 8. For the reasons that follow, I conclude that Flores was subjected to an arrest.

#### 1. De Facto Arrest

The First Circuit has held that "a de facto arrest occurs when a reasonable man in the suspect's position would have understood his situation, in the circumstances

6

then obtaining, to be tantamount to being under arrest." *United States v. Jones*, 700 F.3d 615, 624 (1st Cir. 2012) (internal quotation omitted). The court must objectively assess the totality of the circumstances to determine the reasonableness of the officers' actions in light of developing conditions. *Id.* at 625. Factors such as the use of handcuffs do not necessarily turn an investigatory stop into a de facto arrest, but are circumstances that should be considered in making that determination. *See id.*; *see also United States v. Chaney*, 647 F.3d 401, 409 (1st Cir. 2011).

Here, the officers approached Flores and immediately placed him in handcuffs. They searched him and seized the key to his hotel room. They briefly questioned him and then brought him, still in handcuffs, inside the hotel to the door of his room. The Government argues that these measures were reasonable in light of Flores' size, the officers' reasonable suspicion that he had drugs concealed on his person that might easily be destroyed, the information that there were other members of his group who might be nearby, and the fact that drug trafficking is "commonly associated" with violence. *See* ECF No. 22 at 11.

The First Circuit has recognized that while the use of handcuffs does not necessarily convert an investigatory stop into a de facto arrest, this "does not imply that law enforcement authorities, acting on less than probable cause, may handcuff suspects as a matter of routine." *United States v. Acosta-Colon*, 157 F.3d 9, 18 (1st Cir. 1998). Because the use of handcuffs "substantially aggravates the intrusiveness of a putative *Terry* stop[,]"

> when the government seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a *Terry* stop,

it must be able to point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.

*Id.* at 18-19 (citation and internal quotation omitted) (emphasis in original). Here, the Government had no specific information that Flores was armed, and Flores was cooperative and did not resist the officers or show signs of becoming violent. These circumstances weigh in favor of finding that the use of handcuffs converted the stop into a de facto arrest. *See id.* at 19 (finding de facto arrest where suspect was cooperative and officers had no specific information that suspect was armed, despite the Government's suggestion that connection between drug trafficking and violence supported suspicion that suspect could have been armed). On the other hand, Flores' physical size and the suspicion that he was part of a larger group are specific circumstances that may contribute to a reasonable belief that the officers' safety was at risk.

The Government also relies on the fact that Flores was suspected to be in possession of contraband to justify the officers' use of handcuffs during the detention. ECF No. 22 at 9. The Government posits that Flores may have tried to destroy or conceal evidence if he had not been restrained, *id.* at n.9, but does not identify any cases where courts have held that the risk of destruction of evidence justifies the use of handcuffs during an investigatory stop. All of the cases cited by the Government where the use of handcuffs was found not to constitute a de facto arrest involve either knowledge or a reasonable suspicion that the suspects were armed and presented a

safety risk. *Id.* at 10-11; *see Chaney*, 647 F.3d at 409-10 (protective sweep revealed ammunition and weapon); *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004) (police had information suspect was currently armed); *Jones*, 700 F.3d at 619 (tip to police included information that suspects were armed with handguns); *United States v. Taylor*, 162 F.3d 12, 22 (1st Cir. 1998) (suspect only handcuffed after discovery of weapons).

In addition to placing Flores in handcuffs, the officers also seized his room key, performed a pat-down search of his person, and moved him from outside the hotel into the hallway near his hotel room. These circumstances are relevant to the determination of whether a reasonable person in Flores' position would have understood himself to be under arrest. *See Acosta-Colon*, 157 F.3d at 17-18 (finding that relocation of suspect during detention supported finding of de facto arrest where it was not necessary for reasons of safety or security). The Government points to the "dynamic situation" confronting the officers, ECF No. 22 at 9, but fails to explain how moving Flores and positioning him directly outside Room 131 facilitated the investigatory purpose of the detention, in light of the fact that the officers were concerned about interference from other members of Flores' group, whom they suspected to be inside Room 131. While reasons of safety and security may justify moving a suspect during an investigatory stop, *see Florida v. Royer*, 460 U.S. 491, 504-05 (1983), the Government has not shown how moving Flores to the room thought to contain his fellow drug traffickers was reasonably necessary to safely conduct the investigation.

Considering the totality of the circumstances, including the officers' use of handcuffs, the seizure of the room key, and the relocation of Flores to the hotel hallway, a reasonable person in Flores' position would have understood his situation to be tantamount to an arrest. *See Jones*, 700 F.3d at 624. Therefore, Flores' detention constituted a de facto arrest.

## 2. Probable Cause

An arresting officer has probable cause "when, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (ellipses in original) (internal quotation omitted). The inquiry is an objective one, based on the facts known to the officer. *Id.* The particular officer's subjective intent is not controlling; so long as the circumstances, viewed objectively, justify an arrest, the arrest is valid. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action"). Further, "a law enforcement officer's training and experience may yield insights that support a probable cause determination." *United States v. Floyd*, 740 F.3d 22, 35 (1st Cir. 2014); *see also United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003)

(recognizing that experienced narcotics officers are able to identify common characteristics of a drug transaction).

At the time Pappas first approached Flores outside the eastern entrance to the hotel, he was aware of the following facts and circumstances supporting probable cause:

- A tip from a confidential informant's anonymous "friend" indicated that a group from New York was selling fifty- and hundred-dollar pieces of cocaine base at the hotel;[1]

- Room 131 was the only hotel room out of 37 rooms that was paid for in cash and rented to an individual from New York;

- Room 131 was located near the eastern entrance to the hotel;

- the hotel's manager confirmed that a group, which included two African-American men from New York, one of whom was obese, was staying in Room 131;

- the occupants of Room 131 had frequent visitors, which was both unusual for the hotel, and consistent with trafficking smaller amounts of drugs, such as the fifty- and hundred-dollar pieces described in the tip;

- the manager was suspicious that the occupants of Room 131 may be involved in drug activity due to the number of visitors and the frequency of the occupants' coming and going, and assumed that they were the reason behind the officers' visit;

- the officers saw an individual arrive at the hotel, approach the hotel's eastern entrance, and then return to his car and depart minutes later, a pattern consistent with a drug transaction;

---

[1] The parties dispute how this tip should be characterized: Flores claims it should be treated as an anonymous tip, ECF No. 57 at 1-2, while the Government argues that it is more reliable than an anonymous tip because it was relayed through a reliable source, ECF No. 49 at 1 n.2. Regardless of how the tip is characterized, however, its reliability was later corroborated by the officers' independent investigation. *See United States v. Jones*, 700 F.3d 615, 622 (1st Cir. 2012).

- while in Room 132, the officers observed a car park near the eastern entrance, an obese African-American male matching the description of one of the occupants of Room 131, later identified as Flores, approached the car from the direction of the eastern entrance, and he and the occupants of the car engaged in what appeared to be a drug transaction;

- the man was observed shifting his weight and reaching in a manner consistent with someone reaching for drugs concealed on his person;

- the man was next observed counting money after the exchange, suggesting that he had just completed a drug transaction;

- soon thereafter, the same man was observed openly smoking marijuana after the car had left;[2] and

- the man showed Pappas his room key outside the eastern entrance, indicating that he was a guest at the hotel.

Under these circumstances, a reasonable officer in Pappas' position, relying on his or her training and experience, would be justified in believing that Flores had committed a drug trafficking crime. Therefore, although Flores' detention did amount to a de facto arrest, it was proper because it was supported by probable cause.

## B.      Search Outside the Hotel

Shortly after the officers approached Flores and placed him in handcuffs outside the eastern entrance to the hotel, Pappas conducted a pat-down search that revealed two cellular phones, a quantity of cash, a photo ID, and a room key. After a valid arrest, police may conduct a search of a defendant's person and immediate

---

[2] While not direct evidence of drug dealing, Flores' open disregard for the law and possession of a controlled substance were factors that could reasonably contribute to the officers' suspicion that he was engaged in illegal drug trafficking.

surroundings without a warrant. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2175-76 (2016). As explained above, the officers had probable cause to arrest Flores at the time they initially detained him. Therefore, the search of his person, yielding the phones, cash, room key, and ID, was proper as a search incident to arrest.

## C.    Flores' Connection to Room 131

During his detention outside the eastern entrance to the hotel, Flores told Pappas and Bourgoin, in response to questioning, that he was staying in Room 131, and that nobody else was present in the room. Flores argues that these statements must be suppressed because they were the result of a custodial interrogation without the benefit of *Miranda* warnings, and that without them there is no evidence of a connection between Flores and Room 131. ECF No. 57 at 18.

"Failure to warn a person of their *Miranda* rights renders inadmissible any statement elicited in the course of the custodial interrogation." *United States v. Candelario-Santana*, 834 F.3d 8, 18 (1st Cir. 2016). Custodial interrogation requires that the defendant be in custody and subject to interrogation, meaning "either express questioning or its functional equivalent." *United States v. Jackson*, 544 F.3d 351, 356-57 (1st Cir. 2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). Here, Flores' statements were given in response to police questioning shortly after he was subject to a de facto arrest, while he was in handcuffs. As he had not been advised of his rights under *Miranda*, Flores' statements are ordered suppressed.

But although Flores' statements regarding Room 131 were obtained in violation of *Miranda*, there was nonetheless sufficient evidence linking Flores to

Room 131 to support the later search of that room. The initial tip concerned a group from New York selling drugs out of a room at the hotel. The hotel's guest registry revealed that Room 131 was rented to an individual from New York and was paid for in cash, which Pappas identified as a possible indicator of criminal activity. The hotel's manager independently described the activity in Room 131 as suspicious due to the frequent visitors to the room, and confirmed that a group was staying in the room. Room 131 was located close to the eastern entrance to the hotel, near which the officers observed two possible drug transactions. Flores, who the officers observed taking part in the second likely drug transaction, matched the description of one of the occupants of Room 131. The officers confirmed when they found his room key and ID during their pat down of Flores that he was a guest of the hotel, and that he was from New York.

The officers therefore had reason to believe that drugs were being sold out of Room 131 by a group from New York, which included an obese African-American man. They also observed Flores, an obese African-American man from New York, participate in a likely drug transaction near the hotel door closest to Room 131. These circumstances provided more than enough evidence to support the inference that Flores was staying in Room 131, even without his statement confirming that fact. *Cf. United States v. Ribeiro*, 397 F.3d 43, 49-50 (1st. Cir. 2005) (finding that police established probable cause nexus between drug trafficker and apartment based on surveillance and conclusions drawn from officer's training and experience).

**D.     Entry into Room 131**

Flores contends that the officers' warrantless entry into Room 131 shortly after they arrested him violated the Fourth Amendment.  ECF No. 57 at 16-18; ECF No. 19 at 8-12.  The Government argues that the entry was justified by exigent circumstances, ECF No. 22 at 16-17, and, in the alternative, that the evidence is saved by the independent source doctrine, ECF No. 49 at 12-13.  Because I conclude that the independent source doctrine applies, I focus only on that issue and do not address the exigent circumstances question.

The First Circuit has laid out a two-part inquiry for determining whether the independent source doctrine saves a warrant that is tainted by an unlawful search or entry: "(1) whether the agents' decision to seek the warrant was prompted by what they had seen during their initial entry, and (2) whether the affidavit [in support of the search warrant] contained sufficient facts to support probable cause when the offending facts were excised."  *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005) (citations omitted).

**1.  Decision to Seek a Warrant**

To support application of the independent source doctrine, the Government must show that the decision to seek the warrant was not influenced by what the officers saw during their entry into Room 131.  *See Dessesaure*, 429 F.3d at 369.  This prong calls for a factual determination of the officers' subjective intent, but that subjective intent "should not be proven by purely subjective means."  *Id*.  Specifically, I am "not bound by after-the-fact assurances of [the officers'] intent, but instead must

15

assess the totality of the attendant circumstances to ascertain whether those assurances appear implausible." *Id.* (quotation omitted).

The totality of the circumstances support the conclusion that the officers would have sought a warrant for Room 131 even if they had not entered it. The fact that the officers had not initiated the search warrant application process prior to entering the room does not preclude application of the independent source doctrine. *See United States v. Jadlowe*, 628 F.3d 1, 10 (1st Cir. 2010). Based upon everything known to the officers when they first confronted Flores, it was reasonable for them to believe that he was using Room 131 as a base for drug dealing, and that evidence of the same would be found in the room. *See United States v. Rivera*, 825 F.3d 59, 65 (1st Cir. 2016) (noting that "common sense" supports the conclusion that evidence of drug trafficking will be concealed in the trafficker's residence). These circumstances provide strong support for Pappas' testimony that he had decided to search the room—either by consent or, if necessary, by a warrant—before he entered the room. I am satisfied that the officers would have sought a warrant to search Flores' room regardless of the information they gleaned after entering it and then encountering the woman who reported that Flores was engaged in drug dealing.

Thus, the Government has satisfied the first prong of the *Dessesaure* test by establishing that the officers' decision to seek a warrant was not prompted by their entry into Room 131.

## 2. Probable Cause

The First Circuit has held that the second part of the *Dessesaure* inquiry is controlled by the approach laid out in *Franks v. Delaware*, 438 U.S. 154 (1978). *See Dessesaure*, 429 F.3d at 367. Therefore, "when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *Id.*

The search warrant affidavit does not contain information derived from the observations the officers made inside Room 131. *See* Govt. Exhibit 10B. It does, however, contain Flores' statements that he was staying in Room 131 and no one else was present in the room, made before he was read his *Miranda* rights, as well as information gathered from the officers' interview of the woman. As discussed above, the information known to the officers before they entered Room 131 was sufficient to support probable cause to arrest Flores, as well as to establish a connection between Flores and Room 131. It follows that the search warrant affidavit contained sufficient information to support probable cause to search Room 131, even after excising all information derived from Flores' statements and the interview of the woman.

In *United States v. Barnes*, 492 F.3d 33, 37 (1st Cir. 2007), the First Circuit found that an affidavit was sufficient to support probable cause to search a residence where the affidavit contained information that the defendant sold drugs shortly after leaving the residence, though it contained no direct evidence that the defendant lived in the residence or that he sold drugs out of the residence. *See also United States v.*

*Feliz*, 182 F.3d 82, 88 (1st Cir. 1999) (finding probable cause to search drug-dealing defendant's home as a "likely place to seek to find incriminating items"). Here, the officers had information that Flores was staying in and suspected of dealing drugs out of Room 131, and they observed him engage in what was likely a drug sale after walking from the direction of the hotel's eastern entrance near Room 131. Proximity matters. That information provided probable cause to believe that evidence of drug dealing would be found in Room 131. Accordingly, the second prong of the *Dessesaure* test is satisfied.

For these reasons, I conclude that the evidence seized from Room 131 is admissible under the independent source doctrine and should not be suppressed.

### III. CONCLUSION

For the foregoing reasons, defendant Charles Flores' motion to suppress evidence (ECF No. 19) is **GRANTED IN PART** with respect to Flores' statements that he was staying in Room 131 and no one else was in the room, made immediately following his arrest, and is **DENIED** in all other respects.

**SO ORDERED.**

Dated: December 20, 2016

_____/s/ Jon D. Levy_____
**U.S. DISTRICT JUDGE**